VAWTER *v.* GRIFFIN ET AL.

CONTRACT.—*Promissory Note.—Credit by Balance on Account.*—Where by the agreement of three parties, any balance found due upon settlement between two of the parties is to be credited upon a note executed by two of the parties, one as principal and the other as surety, to the third party as payee, such balance on being found has the force and effect of a payment.   The contract being between three, it cannot be annulled by two of the contracting parties.   The balance being struck and the credit entered, the agreement becomes executed.   Any dispute between the maker and surety on the note, as to the proper amount of the credit, does not affect the payee of the note.

STATUTE OF FRAUDS.—*English Statute.*—*Omission of Words " Wares and Merchandise."*—*Legal Effect.*—In adopting the seventeenth section of the Statute of Frauds of Charles II. as the seventh section of our own act, but omitting after the word *"goods"* the words *"*wares and merchandise," the legal effect of the section remained the same, and the construction given to the seventeenth section by the English courts and text writers may properly govern us in placing a meaning to the seventh section of our act. Neither section includes contracts for the sale of shares or stocks, notes, checks, bonds, or evidences of value.

APPEAL from the Jefferson Common Pleas.

BUSKIRK, J.—This action originated before a justice of the peace, and was based upon a note executed by Joseph Griffin and Garrett Williams, payable to James G. Moore, for one hundred and twelve dollars and sixty-five cents, and by him assigned to the appellant.

It was admitted that Williams was the surety of Griffin on the note. Williams made no defence before the justice or in the common pleas. Griffin, in addition to the statutory denial, pleaded a set-off. The cause was tried by the justice, and resulted in a finding for the plaintiff in the sum of seventy-one dollars and sixty cents.

The justice of the peace, upon the application of Griffin, granted a new trial. The cause was again tried by the justice, and resulted in a finding and judgment for the plaintiff in the sum of forty-seven dollars and ninety cents.

Griffin appealed to the common pleas, where the cause was tried by a jury, resulting in a verdict for the plaintiff in the sum of twenty-eight dollars and ten cents. The appellant moved the court for a new trial, which motion was overruled by the court, and the appellant excepted. The court rendered judgment on the verdict of the jury for appellant in the sum of twenty-eight dollars and ten cents, and for appellees for the costs in the common pleas.

The appellant has assigned for error the overruling of the motion for a new trial.

There is but one question in the case, and that arises on the instructions asked by the appellant and refused by the court, upon the instructions given by the court on its own

Vawter *v.* Griffin *et al.*

motion, and upon the evidence.   As the instructions asked, and those given, were very lengthy, it will be more convenient, and quite as satisfactory, to decide the case upon the sufficiency of the evidence to sustain the verdict and judgment.

The facts, as disclosed by the evidence, are substantially as follows:   James G. Moore, the payee and assignor of the note sued on, made a public sale of his property; Griffin and Williams went to the sale together; while on the way, Williams represented that Moore was indebted to him in the sum of seventy-five dollars, and offered to sell the same for fifty dollars, payable in sixty days; Griffin agreed to purchase the debt at fifty dollars, and give his note payable in sixty days, if he purchased any property at Moore's sale; Griffin purchased, at the sale, a horse and some small articles, amounting to one hundred and twelve dollars and sixty-five cents; it was agreed between Griffin and Williams that it should be represented to Moore that Williams owed Griffin, and had transferred to him, in payment of such indebtedness, the debt on Moore; Williams and Griffin accordingly told Moore that Griffin had purchased the claim on him for seventy-five dollars, which Griffin demanded should be deducted from the amount of his purchase; Moore did not object to the assignment of the debt to Griffin, but claimed that he did not owe Williams that much, and refused to deduct the seventy-five dollars; it was then agreed between the three, that Griffin should give his note to Moore for one hundred and twelve dollars and sixty-five cents, with Williams as surety, and that Moore and Williams should meet in Dupont on a subsequent day, have a settlement, ascertain the exact amount of Moore's indebtedness to Williams, and place the amount so found due as a credit upon said note for one hundred and twelve dollars and sixty-five cents; Moore and Williams accordingly met, had a settlement, ascertained that the former owed the latter forty-four dollars, which sum they entered as a credit upon the note.   Griffin was not present at the settlement between Moore and Williams, nor when

the credit was entered on the note, but arrived soon afterward.

Up to this point there is no conflict in the evidence upon any material point. What subsequently occurred is stated thus by Griffin: "Just after they had settled, Williams came to me with the note, and told me that he and Moore had settled, and that he had to take back some plows that he had sold Moore, and made some deductions in some repairing he had done for Moore, and that they had agreed that Moore owed him forty-four dollars, which amount he had placed as a credit upon the note, and handed me the note with the credit of forty-four dollars endorsed on it. I told Williams that was not our agreement; that I was to have seventy-five dollars, and that I would have that amount. Williams then said he would allow the one-third of the forty-four dollars; I told him that was not our agreement, and that I would not do that. I told Williams that I expected to make a profit of twenty-five dollars in buying the horse, and would not have bought the horse if he had not asserted that Moore owed him seventy-five dollars, and that I would hold him for the twenty-five dollars I expected to make. Williams then said that he would take the credit off, and went away. I saw Moore shortly afterward, and asked him to let me see the note; he showed it to me; the credit of forty-four dollars was scratched off. I told him he had no right to do it, and that I would claim a credit of seventy-five dollars. He said Williams had promised to stand between him and harm, and would not ask him to pay the note if I held him to the credit. I replied, 'if I were to pay you a twenty dollar bill on a debt, and Garrett Williams were to burn it up, you would expect me to pay it again.' He said he would not pay Williams the note he had given."

What took place between Moore and Williams, in reference to the erasing of the credit, is stated thus by Williams: "No one was present but Griffin and myself; Moore had gone over to the shop; I then went over to Moore's and told him what Griffin said, and asked Moore if he would

give me his own note for the amount he owed me; he said he would, and did; I then scratched the credit of forty-four dollars off and gave the note back to Moore."

Griffin also testified that, subsequent to the above transaction, he tendered his note to Williams for fifty dollars, in pursuance of his agreement, but that Williams refused to accept the note. Williams, however, testified that Griffin had neither paid him the fifty dollars nor tendered him his note for such sum.

Williams also testified that just after his settlement with Moore and the entering of the credit on the note, he met Griffin and showed him the note and the amount of the credit; he said that he wanted more than that; that he would have more, or he would have nothing; that he told him that he and Moore had settled, and that that was the amount found due from Moore to him, and that if he would not take that, he would not take anything, as he would take the credit off.

Williams gave the following account of what occurred at the time the note was executed. He says: "After the sale was over, and Griffin had bought a horse and some other things, Moore came to me and asked me for the note; said he wanted to see it; I told him it was at home; Moore then said Griffin wanted him to allow him a credit of seventy-five dollars for what he owed me, and said he would not do it, that he did not owe me that much; I then told him to come down to my house and we would settle; he said he would do so as soon as he got time—that he would be down in a few days; Moore then told Griffin to give his note for the whole amount of what he had bought at the sale, and that when he and I settled we would give him credit for the amount he, Moore, owed me; Griffin did give Moore his note for the amount, which I think was one hundred and twelve dollars and sixty-five cents, and I signed it as security, and we all, Griffin, Moore, and myself, agreed that whatever amount would be found due me by Moore, when we settled, would be placed as a credit on the note given by Griffin to Moore."

The note sued on was executed on the 24th day of September, 1869. The settlement was made between Moore and Williams, and the credit entered and erased on the 26th day of September, 1869. Moore assigned the note to appellant about the 20th of October, 1869, but did not notify Griffin of the assignment until in August, 1870.

Upon the foregoing facts, the court instructed the jury that Griffin was entitled to a credit of the forty-four dollars, which Moore owed Williams. Was the instruction correct? and can a verdict based upon such evidence be sustained? The positions assumed by the appellee are stated as follows, in the brief filed by his counsel: "From this evidence it was competent for the jury to find,

"First. A contract of novation, whereby Williams accepted Griffin as his debtor instead of Moore, with the consent and agreement of the latter; and that it was executed.

"Second. That Griffin did not consent to any change in the terms of this contract.

"Third. That Moore was immediately notified by Griffin that he would hold Moore to the credit, and that Moore assented by saying he would not pay Williams the forty-four dollars.

"Fourth. That Griffin's contention was with Garrett Williams for misrepresenting the amount of Moore's debt, and a claim to hold Williams responsible for the twenty-five dollars discount which he had expected to make by the purchase of Moore's debt.

"Fifth. That the evidence proves, or tends to prove, that the transaction amounted, in fact, to a payment of forty-four dollars on the note sued on."

It is contended by the appellant, that upon the facts there was no novation; that the transaction did not amount to a payment on the note, and that if it was not a payment, it cannot be pleaded as a set-off against the assignee of the note; that the agreement between Williams and Griffin for the sale of the debt on Moore was by parol; that the debt

amounted to more than fifty dollars, and the contract not being reduced to writing and signed by the parties, and no part of the purchase-money having been paid, the contract was void under the statute of frauds.

The appellee insists that there was a complete novation and payment, and that the sale of a note or account does not come within our statute of frauds.

Williams, in his testimony, says: "And we all, Griffin, Moore, and myself, agreed that whatever amount would be found due me by Moore when we settled would be placed as a credit on the note given by Griffin to Moore." Subsequent to this agreement, a settlement was made between Williams and Moore, when it was ascertained that Moore owed Williams forty-four dollars, and such amount was entered as a credit upon the note. By the agreement between the three parties, the balance found due upon settlement was to be entered as a credit. When the balance was found, it had the force and effect of a payment. The contract having been made by and between three, it could not be annulled by two of the contracting parties. The balance having been struck and the credit entered, the agreement was executed, and such credit became a payment and satisfaction *pro tanto* of the note sued on. It is true that Griffin insisted on a larger credit; but that was a controversy between Griffin and Williams, in which Moore had no concern, as he was only bound to credit the note with what he owed Williams. Moore having entered the credit on the note, Williams had no power to erase the credit. The note did not belong to Williams, and he having sold and transferred his debt on Moore to Griffin, and agreed that the same should be entered as a credit, could not avoid his contract, without the concurrence of the other contracting parties. Vawter, the assignee of the note, took the assignment of the note subject to all defences that could have been made while owned and held by the original payee. The settlement having been made and the credit entered before Moore assigned the note

to Vawter, the latter took the note subject to any defence which could have been made if Moore had continued to hold the note and had brought the suit.

It is also insisted by the appellant that the contract between Williams and Griffin was within the seventh section of our statute of frauds, and was therefore void.

The seventh section of said statute provides, that "no contract for the sale of any goods, for the price of fifty dollars or more, shall be valid, unless the purchaser shall receive part of such property, or shall give something in earnest to bind the bargain, or in part payment, or unless some note or memorandum in writing of the bargain be made, and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized." 1 G. & H. 351.

The solution of the question will depend upon the meaning to be attached to the word "goods," as used in the above section. Is the word comprehensive enough to embrace promissory notes and things in action? A legislative construction has been placed upon the phrase "personal property" and the word "property." The word "property" includes personal and real property. The phrase "personal property" includes goods, chattels, evidences of debt, and things in action.

The phrase "personal property" is a much more comprehensive term to designate objects of ownership than the word "goods." The word "goods" is defined by Webster as follows: "Goods, *n. pl.* Movables; household furniture. 2. Personal or movable estate, as horses, cattle, utensils, etc. 3. Wares; merchandise; commodities bought and sold by merchants and traders." The word is defined by Worcester as follows: "Goods (gudz), *n. pl.* 1. Movables; personal or movable estate; furniture; chattels; effects. 'All your goods, lands, tenements.' *Shak.* 2. Wares; freight; merchandise; commodities. 'When the "goods" of our English merchants were attached.' *Raleigh.* Syn.—The

term *goods* comprehends a person's furniture and other movables, or movable property; *chattels,* cattle, implements of husbandry, etc.; *goods* and *chattels,* personal estate and effects. *Effects* is a term nearly synonymous with goods, and includes lands, tenements, furniture, etc. The goods or merchandise of a trader; a manufacturer's wares; the commodities of a country."

The word "chose," and the phrases "choses in possession" and "choses in action," are defined by Bouvier as follows: "Chose (Fr. thing): personal property. Choses in possession: personal things of which one has possession. Choses in action: personal things of which the owner has not the possession, but merely a right of action for their possession."

The phrase "chose in action" is defined by Burrill to be a thing which a man has not the actual possession of, but which he has a right to demand by action, as a debt or demand due from another.

All the definitions of the word "goods" refer to things that are visible and in possession, while the definition of "chose in action" refers to something invisible, intangible, as a debt or demand or right of action.

Our statute of frauds is substantially that of Charles II. It was said by this court, in *Bowman* v. *Conn,* 8 Ind. 58, that, "with the statute, the courts generally adopt the English construction of it as good authority."

The seventh section of our statute corresponds with the seventeenth section of the English statute, which latter section reads as follows:

"Sec. 17. No contract for the sale of any goods, wares, and merchandise for the price of ten pounds sterling, or upwards, shall be allowed to be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part payment, or that some note or memorandum in writing of the said bargain, be made and signed by the parties to be charged

by such contract, or their agents thereunto lawfully author-ized." Browne Statute of Frauds, 504.

The only difference in phraseology is, that in the English statute the words "goods, wares, and merchandise" are used, while in our statute the word "goods" alone is used. We are of the opinion that the change in phraseology between the two sections makes no difference in legal effect. It will be seen from an examination of the above definitions that the word "goods" includes and embraces the words "wares and merchandise." The two sections being, in legal effect, the same, and having borrowed our statute from the English statute, we may very properly adopt and be governed by the construction which has been placed upon the seventeenth section of the English statute by the English courts and text writers.

It is well settled in England that contracts for the sale of shares or stocks, notes, checks, bonds, and evidences of value are not within the seventeenth section of the statute of Charles II.

*Mussell* v. *Cooke*, Preced. Ch. 533; *Crull* v. *Dodson*, Sel. Cas. Ch. 113; *Duncuft* v. *Albrecht*, 12 Sim. 189; *Humble* v. *Mitchell*, 11 A. & E. 205; S. C., 3 Per. & D. 141; *Heseltine* v. *Siggers*, 1 Exch. 856; *Tempest* v. *Kilner*, 3 C. B. 249; *Bowlby* v. *Bell*, 3 C. B. 284; *Bradley* v. *Holdsworth*, 3 M. & W. 422; *Watson* v. *Spratley*, 10 Exch. 222; *Pawle* v. *Gunn*, 4 Bing. N. C. 445; *Chanter* v. *Dickinson*, 5 Man. & G. 253.

The same legislature which enacted our statute of frauds made the definition of the phrase "personal property." If it had been intended to embrace within the seventh section choses in action, and evidences of debt, as well as the word "goods," the phrase "personal property" would have been employed, as those words would have included "goods, chat-tels, evidences of debt, and things in action."

We are very clearly of the opinion that contracts for the sale of evidences of debt and things in action are not within the seventh section of our statute of frauds.

Vawter *v.* Griffin *et al.*

We are of the opinion that the court committed no error in overruling the motion for a new trial.

The judgment is affirmed, with costs.

*C. E. Walker* and *W. S. Roberts,* for appellant.

*H. W. Harrington* and *C. A. Korbly,* for appellees.